UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| LISA A. GILLIAM | ) | |
| | ) | |
| V. | ) | NO. 2:08-CV-318 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

Plaintiff has filed this action for judicial review of the final decision of the defendant Commissioner of Social Security denying her application for Supplemental Security Income under the Social Security Act. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 8 and 12] which have been referred to the United States Magistrate Judge under the standing orders of the court and 28 U.S.C. § 636.

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff's medical history is summarized in her brief as follows:

In a letter dated September 18, 2003, Nolachuckey-Holston Area Mental Health reported their policy of not providing information until a client has been under their care for a period of no less than six months. Therapist John Waddell further reported Plaintiff began treatment with the facility on July 25, 2003, at which time she received a provisional diagnosis of major depressive disorder. It was further noted Plaintiff was scheduled to see their physician on September 22, 2003 (Tr. 162-163).

Plaintiff received Emergency Room treatment at Hawkins County Memorial Hospital on three occasions from August 26, 2002 through October 26, 2002, due to low back pain. X-rays showed slight straightening of the normal lordotic curvature, with minimal levoscoliosis possibly indicating some degree of paralumbar muscle spasm, as well as Schmorl's node and nonfused secondary ossification of the superior anterior segment of L3. The diagnosis was lumbar strain (Tr. 164-180).

Plaintiff received treatment by and Dr. T. H. Roberson, Jr. and Family Nurse Practitioner (FNP) G. Jane Williams from November 1, 2002 through September 9, 2003. Conditions and complaints addressed include low back pain with radiculopathy, insomnia, nightmares, hot flashes, night sweats, degenerative disc disease, menstrual disturbance, left hip pain, left foot numbness, pelvic pain, right elbow injury, eczema, sebaceous cyst, and stye in eye (Tr. 181-202). On November 29, 2001, Plaintiff underwent EMG/Nerve Conduction Study, due to a history of pain in her left calf and numbness in her left lateral three toes. The impression was abnormal EMG/nerve conduction study consistent with a subacute left lumbar radiculopathy involving the S1 nerve root (Tr. 201-202). Plaintiff underwent MRI of the lumbar spine on January 2, 2002, due to left lower leg radiculopathy. The MRI revealed mild narrowing of the L4-L5 and L5-S1 intervertebral discs; slight central posterior bulging of the L2-L3 and L4-L5 intervertebral discs; and right lateral mild posterior bulging of the L4-L5 intervertebral disc (Tr. 199). On May 10, 2002 lumbar spine x-rays revealed mild scoliosis of the lumbar spine convex left; degenerative disc disease affecting the L1-L2 through L4-L5 disc levels, characterized by disc space narrowing bordered by adjacent endplate osteophytes; a limbus vertebra of the superior aspect of L3 representing protrusion of disc material through the previous ring apophysis of the vertebra; and Schmorl's node deformities through bony endplates at the L1 and L2 levels (Tr. 200). On February 21, 2003, MRI was noted to show some impingement of the L3 nerve root (Tr. 190).

On November 18, 2002, Plaintiff underwent consultative exam by Alice K. Garland, M.S. Plaintiff reported not driving due to going "blank" when she drives and inability to sleep at night without medication. It was noted Plaintiff's father had committed suicide. Plaintiff's insight and judgment appeared fair; her affect was blunted; she seemed mildly sad; and her intelligence was estimated to be in the borderline to low average range. Ms. Garland noted previous testing in her office in 1996 in which Plaintiff tested in the mildly mentally retarded range. Current symptoms included not feeling like getting out due to pain, 30 pound weight loss in six months due to lack of appetite, sleep disturbance, sometimes feeling depressed and that no one loves her, and sometimes feeling withdrawn. On Woodcock-Johnson testing, Plaintiff read on the 3.1 grade level and Math scores were on the 1.6 grade level. The diagnoses were rule out dysthymia, rule out pain disorder due to general medical condition, and rule out dependent personality disorder. Ms. Garland opined Plaintiff may be limited in her ability to do detailed and complex work; her ability to persist and concentrate was limited in regards to

2

concentration and recent memory; and her ability to adapt is difficult to determine (Tr. 203-207).

Plaintiff received additional treatment at Hawkins County Memorial Hospital during 2003. On January 9, 2003, Plaintiff presented with complaints of low back pain radiating into the right leg. The diagnoses were sciatica and lumbar strain (Tr. 223-227). Plaintiff returned on February 9, 2003, with complaints of low back pain and left leg pain. The diagnoses were lumbago and muscle spasm (Tr. 218-222). Plaintiff presented for physical therapy evaluation on February 13, 2003, due to degenerative disc disease, low back pain, constant numbness and tingling to the left lateral aspect of the foot, and occasional sharp pains down the left leg. Exam was remarkable for pain to the left SI joint region with gap in compression test and palpable tightness to the left paravertebral muscles in the lumbar spine (Tr. 215-217). On February 16, 2003, Plaintiff was brought to the Emergency Room by EMS with complaints of increased low back pain radiating down the left lateral leg and difficulty walking. Lumbosacral spine x-rays revealed slight straightening of the normal lordotic curvature with levoscoliosis, suggesting some degree of paralumbar muscle spasm; a Schmorl's node at the vertebral body of L1 and also of L2 posterior end plate; and minimal degenerative hypertrophic changes. The final diagnosis was lumbar strain (Tr. 208-214).

Plaintiff underwent consultative exam by Dr. Roy Nevils on November 4, 2003, at which time she reported a six to seven year history of depression. Asked what makes her depressed, Plaintiff reported feeling like she doesn't have any friends and worrying about things. The frequency of Plaintiff's depression was noted to be two or three days a week. Asked if there is anything that may precipitate or worsen her depression, Plaintiff reported "yeah, if I'm in a situation where I'm uncomfortable – get scared, I'm not good with crowds, sort of freak out." Plaintiff further reported poor sleep due to back pain and that she had let her license expire because she is unable to drive because it hurts her back. Dr. Nevils noted Plaintiff describes some extended adjustment problems involving depression, this being associated first of all with an abusive marriage for many years, then the development of her physical problems. Dr. Nevils also noted Plaintiff can be withdrawn from crowded social situations as a result. Judging by Plaintiff's mental status evaluation, Dr. Nevils felt her intellectual level is no more than borderline range and that as such, she could have at least moderate problems with memory and concentration. The diagnoses were adjustment disorder with depressed mood and borderline intellectual functioning (provisional) (Tr. 228-232).

Plaintiff underwent consultative exam by Dr. David McConnell on November 5, 2003. Presenting complaints included chronic low back pain; back pain with bending, stooping, lifting, and prolonged sitting; chronic bilateral knee pain; and bilateral knee pain with going up and down stairs. Dr. McConnell diagnosed chronic low back pain; chronic knee pain bilaterally, right greater than left; and exogenous obesity, +93 pounds. Dr. McConnell opined Plaintiff can occasionally (up to one-third in an eight-hour workday) lift and carry a maximum of 45 pounds, including upward pulling; can frequently (one-third to two-thirds in an eight-hour workday) lift and carry a maximum of 40 pounds; can stand and walk with normal breaks for a total of at least six hours in an eight-hour workday; and can sit with normal breaks for a total of at least six hours in an eight-hour workday (Tr. 233-237).

On December 6, 2003, a reviewing state agency physician opined Plaintiff is

3

mildly limited by restriction of activities of daily living and moderately limited by difficulties in maintaining social functioning and difficulties in maintain concentration, persistence, or pace. Dr. Regan further noted Plaintiff has experienced one or two episodes of decompensation, each of extended duration (Tr. 238-251). In the attached Mental Residual Functional Capacity Assessment, Dr. Regan opined Plaintiff is markedly limited in her ability to understand, remember, and carry out detailed instructions and to interact appropriately with the general public. Plaintiff was noted to be moderately limited in her ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting (Tr. 253-256). On February 7, 2004, a second reviewing state agency physician agreed with these assessments (Tr. 252, 257).

On January 9, 2004, a reviewing state agency physician opined Plaintiff can lift and/or carry a maximum of 50 pounds occasionally, 25 pounds frequently; can stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; can sit (with normal breaks) for a total of about six hours in an eight-hour workday; and can only occasionally climb ladder/rope/scaffolds (Tr. 258-263). On February 10, 2004, a second reviewing state agency physician offered an identical assessment (Tr. 273-282).

Plaintiff received treatment at Church Hill Family Practice from February 11, 2004 through March 3, 2004, upon referral by FNP Williams for evaluation of bilateral knee pain. Plaintiff's past medical history was noted to be significant for indigestion, peptic ulcer disease, two C-sections, endometriosis, degenerative disc disease, chronic lower back pain, chronic left foot numbness, and bilateral knee pain, and intermittent swelling in the left knee. On physical exam, Plaintiff had tenderness all over the joint line in the left knee, possible instability and internal derangement in the left knee, and crepitus in both knees. Dr. Mitri's impression was probable left knee internal derangement; probable degenerative joint disease in both knees; and chronic back pain with possible radicular symptoms. Bilateral knee x-rays revealed similar appearing joint space narrowing about both medial femoral, tibial compartments, compatible with osteoarthritis. Left knee MRI yielded the conclusion of: 1) Mild changes of hypertrophic osteoarthritis involving the left knee joint with some erosion of the articular cartilage of the medial compartment of the left knee primarily the articular cartilage of the left medial femoral condyle along with some medial juxtaarticular osteophyte formation; 2) Mild changes of chondromalacia patella; and 3) Increased red marrow signal involving the distal shaft of the right femur and proximal shafts of the right tibia and fibula, which can be seen in obese patients as well as habitual smokers, or may also be a manifestation of anemia (Tr. 264-272).

Plaintiff continued treatment by FNP Williams and Dr. Roberson from October 9, 2003 through March 17, 2005. Conditions and complaints addressed during this time include right elbow pain, right elbow lateral/medial epicondylitis, acute sinusitis, bronchitis, degenerative disc disease, low back pain, chronic bilateral knee pain, hematochezia, degenerative joint disease, bilateral foot pain, muscle spasms in back, tooth abscess, bilateral knee osteoarthritis, earaches, gastroesophageal reflux disease (GERD), uterine fibroid, head/chest congestion, hematuria, pelvic pain, and vaginal bleeding (Tr. 283-319). On April 1, 2005, FNP Williams opined Plaintiff can lift/carry

4

a maximum of ten pounds occasionally, five pounds frequently; can stand/walk for a total of three hours in an eight-hour workday, ½ hour without interruption; can sit for a total of eight hours in an eight-hour workday, ½ hour without interruption; can never climb, stoop, kneel, balance, crouch, or crawl; and has environmental restrictions in regard to exposure to heights and moving machinery. To support her assessment, FNP Williams noted Plaintiff's degenerative disc disease and degenerative joint disease, as well as a safety issue due to Plaintiff having to take sedating analgesics for pain (Tr. 320-321).

Plaintiff continued treatment by FNP Williams and Dr. Roberson from April 6, 2005 through September 7, 2005, due to degenerative disc disease, pelvic pain, endometriosis, left eye stye, hot flashes, headaches, nausea, diarrhea, constant back pain, acute sinusitis, and difficulty kneeling due to knee pain. Exams remained positive for tenderness in the lower back (Tr. 322-328).

On May 13, 2005, Plaintiff underwent laparoscopy, fulguration of endometriosis, hysteroscopy, and D&C, by Dr. Robert D. Saunders. The postoperative diagnoses were chronic pelvic pain, dysfunctional bleeding, and history of endometriosis (Tr. 330-339).

Plaintiff continued treatment by FNP Williams and Dr. Roberson from September 27, 2005 through October 26, 2005, due to pelvic pain status post total abdominal hysterectomy, acute sinusitis, muscle spasms, and low back pain secondary to degenerative disc disease (Tr. 343-345).

On April 10, 2007, Plaintiff underwent another consultative exam by Alice Garland, M.S., at which time no testing was performed. Plaintiff reported worsening back problems, a nervous condition, depression, history of spousal abuse, sleep disturbance, and nightmares. Plaintiff had dark circles under her eyes; she sat slumped and walked slowly; she reported problems with memory and attention; she misspelled "world" backwards; she miscalculated serial 7's and 3's; her insight and judgment appeared fair; her intelligence was estimated to be borderline; and she appeared to be a person who may be an easy victim in a relationship. Plaintiff reported that she can sleep for to five hours with medication; that she feels not wanted, not loved, and fearful like something bad is going to happen when she is depressed; that she feels fear when she thinks about the past; and that she has no set time to get up or go to bed; and that she sometimes naps during the day if she is tired. The diagnoses were depressive disorder, NOS; pain disorder which may be associated with both psychological factors and a general medical condition; dependent personality disorder; and borderline intellectual functioning, provisional, no formal testing done. In the body of her report, Ms. Garland opined Plaintiff would have marked limitations in her ability to do very detailed and complex work and moderately limited in her ability to persist, concentrate, work with the public, and adapt (Tr. 440-444). In the attached Medical Source Statement of Ability to do Work-Related Activities (Mental), Ms. Garland opined Plaintiff is markedly limited in her ability to carry out complex instructions and moderately limited in her ability to understand and remember complex instructions, to make judgments on complex work-related decisions, and to respond appropriately to usual work situations and to changes in a routine work setting (Tr. 445-447).[1]

---

[1]Plaintiff's summarization failed to include the opinion of Ms. Garland that "[t]here may be secondary gains (on the part of the plaintiff) from taking on the 'sick role.'" (Tr. 444).

>Plaintiff received treatment at Nolachuckey-Holston Area Mental Health from July 25, 2003 through December 30, 2003, during which time she carried the diagnosis of major depressive disorder, with a current global assessment of functioning (GAF) of 50 and lowest GAF of 45. Problems noted during treatment include moderate to severe depression, depressed mood, blunted affect, insomnia, frequent crying, anxiety, anhedonia, occasional intrusive frightening memories of past abuse, irritability, moodiness, sleep disturbance, low energy and motivation, and excessive worry (Tr. 448-452).
>
>Plaintiff has received treatment at Holston Valley Medical Center. Admission was required from September 13, 2005 through September 16, 2005, due to dysfunctional bleeding, pelvic pain, fibroid uterus, endometriosis, and failure to conservative treatment. Plaintiff underwent total abdominal hysterectomy and bilateral salpingo-oophorectomy by Dr. Robert D. Saunders (Tr. 466-468). On March 2, 2007, treatment was rendered for complaints of chest pain, rib pain, back pain, knee pain, and head pain following a motor vehicle accident. Lumbar spine x-rays revealed L3-4 disc degeneration, unfused apophysis at the anterior aspect of the superior endplate of L3, Schmorl's nodes at the superior and inferior endplates of L1, and mild levo-scoliosis. CT scan of the abdomen showed L3-4 disc degeneration and a few Schmorl's nodes in
the lower thoracic and upper lumbar spine. CT scan of the pelvic showed sclerosis at the bilateral SI joint, left worse than right, as well as ventral abdominal wall hernia containing a small bowel loop. The final diagnoses were L-S strain and chest wall contusion (Tr. 454-465).

Document 9, pgs. 2-10

At the administrative hearing on July 5, 2007, the ALJ took the testimony of Dr. Norman Hankins, a vocational expert. He asked Dr. Hankins to assume a woman of the plaintiff's height, weight, education, and work background. He asked Dr. Hankins to assume that plaintiff had the residual functional capacity for light work. He asked him to assume the plaintiff "has intellectual functioning in the borderline range." Finally he asked Dr. Hankins to assume plaintiff "has an emotional disorder with restrictions regarding her ability to perform work activities consistent with Exhibit C9-F," which was the Deceember 6, 2003, evaluation by the State Agency reviewing psychologist, Dr. Regan, described hereinabove. When asked if there were jobs which such a person could perform, Dr. Hankins opined that there would be 46,000 light level jobs in Tennessee and one and a half million in the national

6

economy. At the sedentary level, there would be 8,000 in Tennessee and 411,000 in the nation. These jobs include those of cleaner, maid, hand packer, assembler and sorter. (Tr. 425-26).

In his decision, the ALJ found that the plaintiff "has the residual functional capacity for light work with an emotional disorder imposing the restrictions cited in Exhibit C9F by the State Agency psychologist and intellectual endowment in the borderline range." (Tr. 392). Based upon Dr. Hankins' testimony, he found that there were a significant number of jobs in the local and national economies which the plaintiff could perform. Accordingly, she was found to be not disabled. (Tr. 395-96).

The Court notes first of all that in a previous action for judicial review filed by the plaintiff, her claim was remanded (Tr. 412-25) to the Commissioner by order of Senior District Judge R. Leon Jordan entered February 5, 2007. The basis for remand is of some importance here. As stated above in the recitation of the medical history, Dr. Nevils opined in November of 2003 that the plaintiff "could have at least moderate problems with memory and concentration." (Tr. 418). The ALJ in that action had held that the plaintiff's only mental limitation was an inability to work with the public. The ALJ, as pointed out by Judge Jordan, did not state proper reasons for dismissing Dr. Nevils' assessment of other mental limitations. The vocational expert in that case, Dr. Robert Spangler, testified on examination by plaintiff's counsel that there would be no jobs the plaintiff could perform if she had moderate problems with memory and concentration. (Tr. 422). Although other evidence was available in the record at that time to support the ALJ's finding, namely the first report of Ms. Garland, the ALJ relied upon the opinion of State Agency Psychiatrist Regan. Judge Jordan

7

pointed out that Dr. Regan had imposed more severe restrictions than Dr. Nevils, finding plaintiff "markedly" limited in her ability to understand, remember and carry out detailed instructions. Therefore, Dr. Regan's assessment could not be the basis for rejecting Dr. Nevils' assessment. (Tr. 422-23). Judge Jordan refused to say that the error was harmless and remanded the matter for further evaluation by the Commissioner. (Tr. 425).

The analysis of Judge Jordan is notable here because the assessment of Dr. Regan, Exhibit C9F found at Tr. 253-56, is the same assessment utilized in the question posed by the ALJ to Dr. Hankins, the vocational expert utilized in the present action, who identified a significant number of jobs such a person could perform. This is directly in conflict with the testimony of Dr. Spangler at the earlier hearing, who unequivocally stated that if the plaintiff had the limitations set forth in Exhibit C9F, there would be no jobs she could perform. (Tr. 370).

While this is similar to one of the plaintiff's assertions of error as discussed below, the Court would point out initially that the defendant Commissioner is not automatically bound by the opinion of an expert in an earlier adjudication, especially where that expert's opinion was not adopted by the ALJ in the earlier decision to deny benefits. This is not like an ALJ finding a person can do only sedentary work and then finding on remand, based upon on the same evidence, that the person can do light or medium work. If information regarding the number of jobs individuals with various infirmities can perform were simply black and white empirical statistics to be quoted from a publication, then there would be no need for vocational experts. Thus, Dr. Regan's assessment cannot be rejected as substantial evidence on the sole basis that a different vocational expert opined in an earlier proceeding that a

8

person with those limitations could perform no jobs.

The plaintiff raises three assignments of error. First, she asserts that the ALJ failed to properly consider the opinion of FNP Williams, plaintiff's longtime treating source. The ALJ did not fail to consider the opinion of Nurse Williams. The plaintiff is correct that Williams' opinion, even though from a medical source who is not an "acceptable medical source" as set out in 20 C.F.R. § 416.913(d), is entitled to be weighed in the balance as set forth SSR 06-03p quoted in plaintiff's memorandum. Plaintiff points to various x-rays, MRI's and other tests as objective evidence supporting Nurse Williams' opinion that plaintiff is basically an invalid. However, this opinion is obviously based to a great degree upon the plaintiff's subjective complaints. The aforementioned tests do show some abnormalities, but the degree of limitation is another matter. Other treating sources such as Dr. Mitri (Tr. 267) did not recommend aggressive treatment. Dr. McConnell's opinion, although from a non-treating consultative examiner, is well-supported. The ALJ properly evaluated the medical evidence, and found that the bulk of the medical record was contrary to FNP Williams' extreme findings. There was substantial evidence to support his physical RFC finding and his rejection of Williams' assessment.

Plaintiff also asserts that the ALJ failed "to properly consider the opinion of the consultative examiner" Alice Garland. Ms. Garland, as noted above, performed two evaluations on the plaintiff, one in 2002 and the second in 2007. The ALJ discusses both in his hearing decision. Plaintiff points out that Exhibit C9F, the assessment of Dr. Regan which was presented to the vocational expert regarding plaintiff's mental impairment and which the ALJ says was "consistent" with the opinions expressed by Dr. Nevils and Ms.

9

Garland, was prepared in 2003, several years before Ms. Garland's 2007 assessment. However, the bottom line test is whether Ms. Garland's 2007 assessment was, in fact, consistent with Dr. Regan's opinion from 2003. Dr. Regan opined that the plaintiff was "markedly" limited in the ability to understand and remember and carry out detailed instructions, and in her ability to interact appropriately with the general public. He found her "moderately" limited in the ability to maintain attention and concentration for extended periods, in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and in her ability to respond appropriately to changes in the work setting. (Tr. 253-54). Using a slightly different form, Ms. Garland opined that the plaintiff had "marked" limitations in her ability to carry out complex instructions. She had "moderate" limitations in her ability to understand and remember complex instructions, to make judgments on complex work-related decisions, and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 445-46). On that form "marked" means "[t]here is a serious limitation in this area. There is a substantial loss in the ability to effectively function." (Tr. 445) "Moderate," on the other hand, means "[t]here is more than a slight limitation in this area, but the individual is still able to function satisfactorily." (Tr. 445). In comparing the 2007 evaluation of Ms. Garland with the 2003 assessment of Dr. Regan which was relied upon by the ALJ and the VE, the Court simply cannot see a significant discrepancy. The fact that Dr. Regan could not have "considered" Ms. Garland's 2007 assessment in 2003 makes no difference because the ultimate limitations of function in Dr. Regan's all-important assessment are consistent with those suggested by Ms. Garland. Also, one must bear in mind that Ms. Garland herself believed that there was

10

a strong likelihood that her evaluation of the plaintiff was clouded by plaintiff's possible desire to be sick in order to get benefits. This is not error.

Plaintiff finally asserts that the ALJ's RFC was flawed because it was not supported by substantial evidence and that the opinion of the VE was flawed because Dr. Hankins did not understand the limitations actually contained in the hypothetical question relating to Dr. Regan's assessment, Exhibit C9F. As discussed above, there was substantial evidence for the RFC finding. As far as the use of Exhibit C9F is concerned, the record of the hearing speaks for itself. The VE was asked to assume the plaintiff had the restrictions set out in C9F. (Tr. 525). Dr. Hankin's said he had read that exhibit and that the plaintiff could perform jobs with those limitations. (Tr. 525-26). This is a strong indication that the limitations set forth in that exhibit were known and understood by Dr. Hankins. The asserted lack of understanding comes from questions asked by the plaintiff's lawyer at the hearing on cross-examination. The only portion of counsel's questioning which Dr. Hankins thought would preclude work was where he was asked what the implications would be if plaintiff was unable to complete a normal workday or workweek. This was counsel's interpretation of the opinion of Dr. Regan that plaintiff was "moderately" impaired in her ability to complete a normal workday and workweek without limitations caused by psychological symptoms, and to perform at a consistent pace. (Tr. 254). "Moderate" means a slight limitation but that the individual can still function satisfactorily. (Tr. 443). The Court simply does not interpret Exhibit C9F to present the limitations suggested in the questions asked by plaintiff's counsel. Dr. Hankins said he read Exhibit C9F and his responses to other questions showed this to be true. The jobs he identified took all of the mental limitations found by the ALJ and

11

incorporated in Exhibit C9F into account.

The ALJ had substantial evidence to support his findings of the plaintiff's residual functional capacity and the question posed to Dr. Hankins. Dr. Hankins understood the limitations actually presented by Exhibit C9F and identified a significant number of jobs plaintiff could perform with those limitations. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 8] be DENIED and the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be GRANTED.[2]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947-950 (6th Cir. 198l); 28 U.S.C. § 636(b)(1)(B) and (C).